## Tucker, et al. v. Pete Sheeran, Bro. & Company.

(Decided November 7, 1913).

### Appeal from Breckinridge Circuit Court.

1. Contracts—Agreement Defined.—An obligatory contract is a species of agreement, and an agreement consists in two persons being of the same mind concerning the matter agreed upon.

2. Contracts—Character of Agreement.—To amount to a contract, an agreement must be of a nature to produce a binding result upon the mutual relations of the parties, therein differing from the agreement of a bench of judges or a board of directors, which has no reference to the relations of the judges or the directors, one to another.

3. Contracts.—Where the terms of a contract have been mutually agreed to, and the parties then made a further agreement to write and sign a paper evidencing those terms, the verbal contract is valid without the writing.

JOHN P. HASWELL, JR. and GUS BROWN for appellants.

CLAUDE MERCER for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Reversing.

The appellants, Tucker, Ballman, Hays and McCoy were appointed a committee for the Farmers Union of Breckinridge County, for the purpose of soliciting bids for the sale of the tobacco held by the Union in the 1910 Pool.

Board had made a bid for the tobacco, and the Union met in the Shrewsbury school house on March 19, 1911, for the purpose of considering Board's offer, and any other offer that might be made. Jarboe, a partner of the firm of Pete Sheeran Bro. & Company, and acting for it, sent in a bid for the tobacco about the time the meeting convened. The meeting was private, only the members of the Union being admitted. Each bid constituted a somewhat extended paper, covering the different kinds of tobacco, for which different prices were offered. Board's bid had been epitomized upon the black-board so that all the members could see exactly what it was; and when Jarboe's bid was received it was likewise placed upon the blackboard. It having been determined that Jarboe's bid was best for the Union, it was, by proper action, accepted, and Jarboe was called into the meeting and notified of that fact.

A written contract had been prepared, based upon Board's offer, and it was shown to Jarboe, who was informed that his contract would be in the same form, with but one or two small changes, and that the secretary would at once prepare it for the signatures of the parties. Jarboe stated that he could not wait for that to be done, but said he would put up his check for $500 as a forfeit that he would take the tobacco under the terms of the contract, which could be sent to him by mail, for his signature. Accordingly, he deposited with the Union his check for $500, payable to its committee, and left the meeting.

In the course of a few days Jarboe received the contract, but declined to sign it; and in a letter to the committee he gave as his reasons for declining to sign it, first, that only three of the committee of four had signed the contract upon the part of the Farmers Union; second, that the contract was silent as to the beginning and ending of the time of delivery; third, that its provisions as to the samples were in conflict with each other; and fourth, that the provision concerning damaged tobacco was incorrect.

At the same time Jarboe enclosed to the committee a writing which covered his view of the agreement. The committee, in turn, declined to accept the Jarboe draft because, as it claimed, the draft did not conform to the agreement theretofore made. Nothing further was done; and when the committee presented the check for payment, the bank refused to pay it, informing the committee that Jarboe had stopped its payment. Thereupon the committee, in the name of its members and for the benefit of all the members of the Union, brought this action against Pete Sheeran Bro. & Company for $500 damages, for its failure to perform the contract, alleging that $500 had been agreed upon between the parties as liquidated damages for a breach of the contract.

In its answer, the defendant traversed the allegations of the petition, and relied upon the following affirmative defenses: (1) that according to the agreement made at the school house, the contract was not to be binding until it had been reduced to writing and signed by the parties; (2) that the contract drawn by the society was different from the contract agreed upon, in the respects above indicated; and, (3) that the appellees' writing which the appellants refused to sign, stated the contract between the parties.

The legal effect of these affirmative defenses is found in the first one that the contract was not to be binding until it had been reduced to writing and signed by the parties; the second and third defenses relating merely to transactions subsequent to the original agreement.

Upon the first trial the jury failed to agree, and were discharged. Upon the second trial, by a majority verdict, the jury found for the defendant; and from a judgment upon that verdict the plaintiffs prosecute this appeal.

An obligatory contract is a species of agreement, and an agreement has been well expressed to consist in two persons being of the same mind concerning the matter agreed upon. But many agreements do not produce any legal effect on the relations of the parties. Holland's Jurisprudence, 174.

To amount to a contract, the agreement must be of a nature to produce a binding result upon the mutual relations of the parties, therein differing from the agreement of a bench of judges or of a board of directors which has no reference to the relations of the judges or the directors one to another. The agreement must purport to produce a legally binding result; the intention of the parties must refer to legal relations, and must contemplate the assumption of legal rights and duties as opposed to engagements of a social character. 9 Cyc., 273.

Or, as stated by Anson, the consequences of agreement must affect the parties themselves. Otherwise, the verdict of a jury by a decision of a court sitting *en banc* would satisfy the foregoing requisites of agreement. "Contracts", 3.

It follows that an agreement may be made by word of mouth; and yet, if it is the intention of the parties that it shall not be binding until put in writing, there can be no enforceable agreement until that is done.

The reason for the rule is, that where the agreement provides it shall not be a binding contract until it is put in writing, the condition is a part of the agreement. The first and most essential element of an agreement is the consent of the parties. There must be the meeting of two minds in one and the same intention. Pollock, page 3.

If something remains to be done before the contract is binding, there is no contract.

If, however, a verbal contract is actually made, the mere fact that it is to be afterwards reduced to writing, does not render it unenforceable, unless it be within the statute of frauds.

In Bell v. Offutt, 10 Bush, 635, Offutt sued Bell for a breach of contract in refusing to accept and pay for one thousand hogs, which Offutt claimed he had sold Bell, who was acting for Hamilton, his undisclosed principal. Bell answered, denying the contract, and claimed that although he and Offutt had discussed the preliminaries of a contract, it was nevertheless understood that there was to be no contract unless it was reduced to writing, which had never been done.

In discussing the case, the court said:

"Upon the question whether a contract was in fact concluded, as claimed by Offutt, or only discussed and left incomplete, to be afterwards finally agreed upon and reduced to writing, as claimed by Bell, the evidence was conflicting, and it therefore became necessary to submit that question to the decision of the jury.

"The instruction asked by Bell made the question whether a contract had been in fact made depend upon his understanding of the legal effect of the agreement to reduce the terms of the contract to writing, and not upon the question whether they in fact agreed upon the terms, and then agreed to enter into a writing as evidence merely of a contract already made.

"The court was clearly right in holding that if the terms of the contract had been mutually agreed to, and the parties then made a further agreement to write and sign a paper evidencing those terms, the contract was valid without the writing."

Tompkins Admx. v. The Southern Baptist Theological Seminary, 8 Ky. L. R., 191; Mattingly v. The Springfield F. & M. Insurance Co., 120 Ky., 768, and Hollerbach & May Company v. Wilkins, 130 Ky., 55, support the doctrine that the mere fact that an oral contract was to be afterwards reduced to writing, does not render it unenforceable.

Appellants insist that the agreement at the school house constituted a completed contract of sale, which was thereafter to be reduced to writing; while appellees contend there was to be no enforceable contract of sale until it had been reduced to writing. And while the appellees had the right to make a contract conditioned upon its becoming effective only after it had been re-

duced to writing, nevertheless the question in this case is, Did the parties make such a contract?

The question, therefore, for the jury to try in the case at bar, was this: Did the parties effect a sale at the school house meeting, the evidence of the contract to be thereafter reduced to writing, or was the contract to buy to be thereafter completed by a written memorial of the agreement?

The court submitted this question to the jury by means of the three following instructions:

"A.   The court instructs the jury that if they believe from the evidence that the Farmers Union of Breckenridge County, Kentucky, at Shrewsbury's school house on the occasion mentioned by the witnesses, entered into an oral contract with the defendants, whereby the said Farmers Union agreed to sell to the defendants the tobacco in controversy for a certain price for each grade thereof, and if the jury further believe from the evidence that the defendants agreed to buy said tobacco and agreed with the plaintiffs as to the price to be paid for each grade thereof, then, in that event the jury will find for the plaintiffs, in the sum of $500 with interest from the 21st day of March, 1910, unless the jury further believe from the evidence that it was agreed between the parties at the time said oral contract was made that said oral contract should not be binding unless and until the same should be reduced to writing, or unless the jury further believe from the evidence that the written contract which was afterwards prepared by Lon Jarboe and which has been read in evidence to the jury correctly sets out the terms of said trade which was made at Shrewbury's school house if any was made there.

"1.   The court instructs the jury that if they believe from the evidence that it was agreed between the parties at Shrewsbury's school house that the oral contract then and there made, was not to be binding unless and until the same was reduced to writing or if the jury shall believe from the evidence that the written contract which was later prepared by Lon Jarboe and presented to the plaintiffs for signature embraced and covered the true terms of the contract made at Shrewsbury's school house, then, and in either of said latter events, the jury will find for the defendants.

2.   Unless the jury believe from the evidence that the plaintiffs and defendants at Shrewsbury's school house entered into an oral contract whereby the plaint-

iffs agreed to sell and defendants agreed to buy the tobacco in controversy, then in that event the jury will find for the defendant."

Instructions 1 and 2 were not only unnecessary, but they no doubt misled the jury, by injecting into their consideration the correctness of the Jarboe draft of the contract, without also submitting the correctness of the appellant's draft of the contract. And, the correctness of the Jarboe contract was again submitted by instruction A.

The real issue in the case being whether the parties made a sale at the school house meeting, or whether there was merely an agreement at that meeting to effect a subsequent sale by a written contract, and it being admitted no written contract was ever made, the question of the correctness of the respective drafts of a written contract was immaterial. If the parties made a contract at the school house meeting, it necessarily follows that appellees broke that contract by refusing to carry it out; on the contrary, if no contract was made at the school house meeting, it equally follows that the appellees did not break their contract, since appellants do not claim it was ever reduced to writing.

The court therefore should have submitted to the jury the single question as to what was the contract between the parties—whether it was an oral contract made at the school house meeting to be thereafter put in writing, or whether it was an agreement to make a subsequent contract in writing.

Instruction A fairly presents the plaintiffs' side of that question if these words are added to the first clause thereof: "although it was then agreed between the parties that the contract should subsequently be reduced to writing"; but it erroneously presented the defendant's side of it, by incorporating into the last clause of the instruction the question of the correctness of the Jarboe draft of the contract. After instructing the jury to find for the plaintiffs upon the hypothesis set forth in the first part of instruction A, when modified as above suggested, the court should have given the defendant's side of the case by instructing the jury that if they further believed from the evidence it was agreed between the parties at the school house meeting that the oral agreement there made should not be binding upon the parties unless and until the same should be reduced to writing, they should find for the defendant. In incor-

porating the question of the correctness of appellee's draft of the contract into instruction A, and into instruction 1, and in giving instructions Nos. 1 and 2 which were unnecessary, the trial court was in error.

Judgment reversed and case remanded for a new trial.