## Nash v. Childers, Jr., et al.

(Decided November 14, 1913).

## Appeal from Woodford Circuit Court.

1. Land—Proposed Sale of.—Cloud Upon Title—Commissions—Action for.—Where the owner of land proposed to sell it only upon the express condition that the cloud upon her title should be first removed, and the cloud was never removed, there was no obligation upon the owner to pay selling commissions, although the proposed purchaser was willing to take the land with the clouded title.

2. Land.—Cloud Upon Title—Conditional Sale—Waiver.—In the case stated above, the condition was reserved for the owner's benefit and protection, and could not be waived by the proposed buyer.

WALLACE & HARRISS for appellant.

H. A. SCHOBERTH and D. J. HOWARD for appellees.

OPINION OF THE COURT BY JUDGE MILLER—Reversing.

The appellees are real estate agents and sued the appellant for $325.00 commissions, claiming they sold her farm of 147 acres in Woodford County to Ernest Hawkins for $16.250.00. At the conclusion of the testimony, the circuit judge directed a verdict for the plaintiffs, and Mrs. Nash appeals.

There is really no dispute about the facts. Mrs. Nash had been in Nebraska during the summer of 1912, and returned home about the middle of October. The appellee Childers, who was a real estate agent at Versailles, inquired of Field McLeod, who was Mrs. Nash's legal adviser, if the farm was for sale. McLeod answered that he did not know, but that he would see Mrs. Nash on the following Sunday and would let Childers know about it. McLeod reported to Childers that Mrs. Nash had authorized him to let Childers effect a sale of the farm at $105.00 per acre, provided he did so before she rented the farm for the ensuing year, and that she had arranged to make the lease with her tenant on the following Tuesday. Under this notice Childers had only Monday in which to make a sale.

Mrs. Nash and the tenant went to McLeod's office on Tuesday and executed a written lease for the farm for the ensuing year; but, with the consent of the tenant, the lease contained a stipulation that if Mrs. Nash sold the farm before the end of the week which would end on

October 19th, the contract of lease was to stand abrogated; otherwise to continue in force. In that way Childers' time for making the sale was extended one week. He accomplished nothing, however, during that time, and recognized that he had no further right under the original employment. After that time McLeod had no authority from Mrs. Nash to instruct Childers to make a sale, and did not pretend to have any such authority, or exercise it in any way.

In the meantime, Childers had secured the co-operation of Bond, a real estate agent of Lexington, to assist him make the sale. Bond had a probable purchaser in Ernest Hawkins; and acting upon Bond's suggestion, shortly after the expiration of the week, Childers asked McLeod if Mrs. Nash was still willing to sell her place; whereupon McLeod answered that he did not know; that she had rented the farm for the ensuing year; that he did not know any reason why she should not sell it if she could get her price, but that he could not speak for her. McLeod handed Childers the lease in order that he might show Bond the clause providing for its abrogation in case of a sale.

On November 30th or 31st, McLeod, in company with Bond and Childers, called on Mrs. Nash to see if she was still willing to sell her farm. The testimony of McLeod states explicitly what happened on that occasion. He said:

"Q. After that, did you see Mrs. Nash in regard to this place?

"A. I did, on the last day of October, I think it was the 31st; it was Thursday I know, either the 30th or 31st. In company with Mr. Bond and Mr. Childers, I went to Mrs. Nash's farm, Mr. Bond having told me that he had an offer from Mr. Hawkins of $16,250.00 for the farm, which was a little less than $105.00 an acre, just lacked $8 or $9 of being $105.00, for the whole tract, and I went to Mrs. Nash's farm with a view of trying to see what I could do to get this sale through.

"Q. What was done?

"A. I went in and acquainted Mrs. Nash with the fact that Mr. Bond had made to me this offer of $16,250 for the farm, provided she would throw in the tobacco sticks. We discussed the matter quite a while in detail. I had already made the calculation and found that it was only $8 or $9 off of $105 per acre for her land, and she finally agreed to the making of the contract upon these

conditions: first, that she reserved the burial ground
of some small area, with right of ingress and egress to
and from it, and to be buried therein; second, that the
posts which had been cut and were intended to be used
in fencing on the farm, should be paid for by the pur-
chaser; third, that no contract was to be made, could
be made until her title to the farm, which was imperfect,
was corrected, and that when her title was made good,
that this contract should be made. I came out. I spent
a good deal of time talking with Mrs. Nash on the two
percent business for these agents—she hadn't under-
stood that, had not anticipated that; I thought she had;
but finally we got that out of the way.

"Q. Did she agree to that?

"A. She did, but it was expressly understood that
she could not and would not make any contract until her
title was in such a position that she would, or rather,
could comply with it. I afterwards explained to these
gentlemen that there was no use in her making a con-
tract to convey that which she did not have, because the
purchaser would not accept it, and she might get her-
self in trouble if she undertook to do that."

As to the perfecting of the title, McLeod further tes-
tified:

"After the deed was returned to me from Mr. Child-
ers and Mr. Bond, and as I told them I would do, I sent
it promptly to Indiana the following day, with directions
as to its execution by the parties necessary there, or
those that I then believed to be necessary there. I got
it back after the lapse of some weeks and found that
there were two infant children owning an interest in it,
so that the title could not be corrected as to that; and
that one of the parties I thought was in Indiana, was
actually living in Japan. I prepared a fresh deed and
sent it to the lady in Japan, and got it back last week."

He further testified that the title to a one-half in-
terest in the fifteen acres had never been perfected and
was still unmarketable.

We are not advised as to the ground upon which the
circuit judge rested his ruling in giving the peremptory
instruction to find for the plaintiffs, although it is sug-
gested in the brief that perhaps that ruling was based
upon the idea that Hawkins was willing to buy the farm
notwithstanding the unmarketable title to the half in-
terest in the fifteen acres. It is not claimed, however,

that Hawkins then indicated his willingness to take the title in its unmarketable condition.

Upon cross examination Hawkins admitted that no arrangement had ever been made as to the terms of payment—whether it should be in cash or upon time; and that the title was to be good, and that he certainly would not have bought it unless the title was perfect.

Again, on re-cross examination, he testified as follows:

"Q. If the title had not been good, would you take it now?

"A. No, sir. I would not want to buy anything that the title had a cloud on. If it could have been a merchantable title I would take it—yes, sir."

We give no force to Hawkins' subsequent testimony, in which he seemingly undertakes to convey the impression that he was willing at the time of the trial to take the title as it was. That fact, if true, was not made known to Mrs. Nash, and could not have changed her obligation if she had been informed of it.

Childers, Bond, Hawkins and McLeod were the only witnesses, and, as above stated, there was practically no dispute about the facts.

It is insisted by Mrs. Nash that the testimony of McLeod shows clearly that there was to be no sale until after the title had been perfected; that it never was perfected, and that no contract was ever made. On the other hand, appellees contend, as we understand them, that the sale was actually made, and that Hawkins being willing to take the title as it now stands, they have earned their fee. But the claim that Hawkins was willing to take an imperfect title is not only not sustained by the evidence, but it could not be given the force claimed for it even though it had been proved.

The agreement to make a contract was dependent upon the three conditions named by McLeod, while Hawkins wanted nothing short of a marketable title. The terms of sale were never agreed upon; and while Hawkins agreed to the first and second conditions of Mrs. Nash's proposition, he did not waive the third condition, and indeed he could not have done so from its very nature. It was her condition, not his; it was reserved for her benefit and protection, not his. The minds of the parties never met upon a contract of sale. Tucker v. Pete Sheehan, Bro. & Co., 155 Ky., 670. Mrs. Nash had the right to predicate her making a contract of sale upon

the conditions named, and so long as anyone of them remained unremoved she was, by the terms of the preliminary agreement, under no obligation to go further; and, as the uncontradicted testimony shows the title was never perfected, the circuit judge should have directed a verdict for the defendant, instead of for the plaintiffs.

Judgment reversed.