UNIT, INC., a Texas corporation, Plaintiff,

v.

KENTUCKY FRIED CHICKEN CORPORA-
TION, a Delaware corporation, and John
Y. Brown, Jr., Defendants.

Superior Court of Delaware,
New Castle.

March 2, 1973.

Andrew G. T. Moore, II, Joseph A. Calvarese, Jr., and J. R. Julian, of Killoran & Van Brunt, Wilmington, for plaintiff; William L. Blum, of Dinsmore, Shohl, Coates & Deupree, Cincinnati, Ohio, and Marvin Lewis, Dallas, Tex., of counsel.

Richard J. Abrams, of Richards, Layton & Finger, Wilmington, and Donald H. Balleisen, Robert Van Young, and Robert F. Matthews, of Greenbaum, Grissom, Doll, Matthews & Boone, Louisville, Ky., for defendants.

## OPINION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

QUILLEN, Judge:

The issues presently before the Court involve cross motions for summary judgment under Civil Rule 56. The facts as to defendants' Kentucky Fried Chicken Corporation and John Y. Brown, Jr. motion for summary judgment, stated in the light most favorable to the non-moving party, are as follows. Unit is a Texas corporation involved in the acquisition, planning, financing, construction, ownership and management of commercial real estate. Unit had its first contact with the defendant Kentucky Fried Chicken Corporation (KFC), a Delaware corporation, on or about June 5, 1969, at which time Thomas Herrington, a Unit Vice-President, and Peter B. Curlin, KFC's Vice-President for corporate development, met to discuss the proposed development of a motel and restaurant complex to be operated for KFC in Lexington, Kentucky. As the groundwork for this possible undertaking progressed, the discussions between the two corporations expanded into consideration of forming a joint venture for the planning, location, financing and construction of KFC's future building needs in the food and motel fields. This was considered as early as September 25, 1969.

A meeting was held to discuss this possible joint venture in the offices of KFC in Louisville, Kentucky, on October 15, 1969. The meeting was attended by Mr. Brown (the President of KFC), Mr. Curlin and others on behalf of KFC, and Mr. Morris (President and Chief Executive Officer of Unit), and Mr. Herrington on behalf of Unit. At this meeting, it is alleged that a joint venture was entered into between KFC and Unit for the purpose of building, owning and leasing back to KFC all future "Fast Food Stores" to be constructed or acquired by KFC. It is further contended by the plaintiff that Mr. Brown, on behalf of KFC, offered Unit 50% of the stock in a corporation through which the joint venture would operate. Finally, all of the terms and conditions of the proposed joint venture were allegedly agreed upon. These included the above mentioned 50% of the stock; the guarantee of any leases by KFC; the payment of a 2% fee above the lease for KFC's guarantee; and an agreed rental formula for said leases. Finally, a letter signed by Mr. Curlin of KFC, dated October 15, 1969, and personally delivered to Mr. Herrington in Louis-

ville, Kentucky, allegedly confirmed the agreements reached.

The next step in the series of transactions was a telephone call on or about October 21, 1969 from Mr. Curlin of KFC to Mr. Herrington of Unit involving a discussion whereby Unit was to arrange for the sale of KFC property and to lease back certain of KFC's existing holdings for a sum in excess of twenty million dollars with all of the excess to be payable to the KFC-Unit Joint Venture. This arrangement was allegedly not within the scope of the original joint venture, but was an expansion of the original agreement. In response to this arrangement, Mr. Herrington personally obtained a letter dated October 30, 1969 and signed by Mr. Curlin. This letter was personally delivered in Louisville, Kentucky.

Unit, as a result of the alleged agreements, employed a Cincinnati, Ohio law firm to draft the necessary documents to give corporate form to the joint venture. William Blum, Esquire drafted the necessary documents and forwarded such to Mr. Curlin at his request.

From October 21, 1969 to November 11, 1969, Mr. Morris proceeded to discuss means by which KFC could effect a sale and lease back of its existing properties with various representatives of institutional investors and investment banking firms. It is alleged that KFC fully understood that Unit was seeking the proposed financing from investment bankers and KFC specifically encouraged Unit to do so.

During this period, Mr. Morris contacted the investment banking firm of Loeb-Rhoades and Company. A meeting was held on or about October 29, 1969 which was attended by Robert Barbanell, Joseph Lesser, Steven Weinroth (all of Loeb-Rhoades), Maurice J. Cohn, Esquire (attorney for Unit) and Mr. Morris. Loeb-Rhoades requested some financial data of KFC at this meeting, which was provided on November 4, 1969 after an initial refusal. It is alleged that the letter containing the refusal was a device to "cover" KFC in case it should be brought under scrutiny by the SEC for providing information prohibited by the SEC Rules. However, the important point is that KFC allegedly provided financial data to Loeb-Rhodes; the data included confidential information; and the purpose of such release was to shop KFC stock.

Between November 4, 1969 and December 9, 1969, Mr. Curlin conferred with representatives of Loeb-Rhoades in New York and a meeting was arranged at KFC offices in Louisville, Kentucky for December 5, 1969, at which Loeb-Rhoades representatives were to be present. No indication was given by KFC at any time that it did not want to deal with investment bankers. However, at the termination of this meeting of December 5, 1969, Mr. Brown informed Mr. Morris that he did not wish to deal with investment bankers since KFC had already made plans for a private placement with its investment banker (Lehman Bros.), and therefore was terminating the joint venture agreement. KFC, nevertheless, continued its contact with Loeb-Rhoades and continued to release financial information to it.

Finally, Unit alleges that it expended $50,000.00 in connection with the joint venture arrangement and that it was deprived of the $5,000,000.00 profit the joint venture would have received as a result of the sale of KFC properties for $25,000,000.00. This sale allegedly would have been completed except for KFC's termination letter of December 11, 1969 since Unit contends that it had received a firm commitment from Loeb-Rhoades for this sum and that interim financing was also available.

Unit brought a suit asserting the following three causes of action:

(1) A claim for violation of § 17 of the Securities Act of 1933 (15 U.S.C. § 77q); § 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j); and Rule 10b-5 (17 C.F.R. 240, 10b-5) promulgated thereunder;

(2) An allegation of breach of contract; and

(3) A claim for common law fraud.

KFC denied all the allegations in the complaint; and, in addition, filed a counterclaim alleging that plaintff knew, or should have known, that the allegations of the complaint relating to violations of the Federal Securities Acts were false and that plaintiff knew, or should have known, that only a purchaser or seller can obtain relief under those Acts and plaintiff was neither. The counterclaim also alleged that plaintiff knew that KFC was about to merge with Heublein, Inc. and that the action was brought to embarrass defendants (KFC and Brown) and for no other purpose. Each defendant therefore requested $10,000.00 actual damage and $5,000,000.00 punitive damages for abuse of process and interference with advantageous relations.

Plaintiff's first cause of action is to the effect that the representations made by the defendants inducing Unit to form·a joint venture and to agree to sell KFC's real property were fraudulent in that the defendants never intended to fulfill the agreement with Unit or to accept the proffered financing. The defendants allegedly made such proposals and representations solely to induce Unit to seek financing from New York investment bankers for the purpose of "shopping" KFC and its stock among investment bankers in order to improve the market price of its stock and to arouse interest in a proposed public issue. The plaintiff contends that these alleged activities were fraudulent and constituted violations of Rule 10b–5 of the Securities and Exchange Commission (17 CFR 240.10b–5) and Section 17 of the Securities Act of 1933 (15 U.S.C. § 77q).

In regard to this first cause of action it should be noted that Rule 10–5 was promulgated pursuant to Section 10(b) of the Securities Exchange Act of 1934 (15 U.S. C. § 78j). It should also be noted that all actions brought under Section 10(b) of the Securities Exchange Act of 1934 are in the exclusive jurisdiction of the United States District Courts (15 U.S.C. § 78aa). Therefore, this Court lacks subject matter jurisdiction of any cause of action brought under Rule 10b–5.

■ However, the Court does have subject matter jurisdiction of violations of Section 17(a) of the Securities Act of 1933, as provided by 15 U.S.C. § 77v. Thus, for this Court to be able to grant relief, plaintiff must bring itself within the requirements of Section 17(a).

Section 17(a) provides:

(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser. (15 U.S.C. § 77q)

The first issue is whether Section 17(a) provides for a private civil cause of action or merely provides for injunctive and criminal relief. Such a private civil cause of action is not specifically provided for in the statute, and therefore it would have to be implied. Several cases have implied such a private cause of action under Section 17(a). See Osborne v. Mallory, 86 F. Supp. 869 (S.D.N.Y.1949); Dack v. Shanman, 227 F.Supp. 26 (S.D.N.Y.1964) and Hecht v. Harris Upham and Co., 283 F.

Supp. 417 (N.D.Cal.1968). However, in Dyer v. Eastern Trust and Banking Co., 336 F.Supp. 890, 903–906 (D.Me.1971) a private civil cause of action appears to have been expressly denied. *Dyer*, although a recent decision concerning the existence of a private cause of action under Section 17(a), was also one of first impression in the First Circuit. The *Dyer* Court appears to have attempted to distinguish the above cases by the fact that no fraud was alleged in *Dyer*. (See Dyer v. Eastern Trust and Banking Co., *supra*, at 336 F.Supp. 904, footnote 20).

■ In the present situation, however, fraud is the basis of the Section 17(a) claim and, therefore, *Dyer* is distinguishable. Therefore, a private civil cause of action does exist under Section 17(a). Barnes v. Peat, Marwick, Mitchell & Co., 69 Misc.2d 1068, 332 N.Y.S.2d 281, 283 (1972).

The next question raised under Count 1, is that Unit lacks standing under Section 17(a) since it was not a "purchaser" of a "security" as required by the rule established in Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir. 1952), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). The established rule of *Birnbaum* is that "only purchasers have standing to sue for violations of the 1933 Act." See Simmons v. Wolfson, 428 F.2d 455, 456 (6th Cir. 1970), cert. denied, 400 U.S. 999, 91 S.Ct. 459, 27 L.Ed.2d 450 (1971); Greater Iowa Corp. v. McLendon, 378 F.2d 783 (8th Cir. 1967); Supt. of Insurance of the State of N. Y. v. Bankers Life and Casualty Co., 430 F.2d 355 (2d Cir. 1970), rev'd on other grounds, 404 U.S. 6, 92 S. Ct. 165, 30 L.Ed.2d 128 (1971); Iroquois Industries, Inc. v. Syracuse China Corp., 417 F.2d 963, 966 (2d Cir. 1969), cert. denied, 399 U.S. 909, 90 S.Ct. 2199, 26 L.Ed. 2d 561 (1970).

In opposition to this rule, the plaintiff argues (1) that the *Birnbaum* rule has been greatly eroded and is now only an island in the stream of precedent, and (2) even if the rule is still applicable, that Unit is a "purchaser" of a "security" as required by the rule.

As to the first contention that the *Birnbaum* rule has been eroded, the plaintiff cites Entel v. Allen, 270 F.Supp. 60 (S.D.N.Y.1967); Kahan v. Rosenstiel, 424 F.2d 161 (3rd Cir. 1970), cert. denied, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970) and Tully v. Mott Supermarkets, Inc., 337 F.Supp. 834 (D.N.J.1972). In citing these cases, Unit directs the Court's attention to the "causal connection" test applied in the circumstances there present.

Regardless of the holdings of the above cases, the Court is of the opinion that the *Birnbaum* rule is still applicable in regard to Section 17(a) claims. The above cases are distinguishable in that they all involved Rule 10b–5 claims. The courts therein, thus, had to interpret the phrase *"in connection with the purchase or sale of securities"* as found in the Rule. The Courts interpreted this phrase to merely require a "causal connection".

■ No such language is found in Section 17(a). Absent such language or any decisions eliminating the *Birnbaum* requirements as to Section 17(a) claims, this Court feels that it must continue to apply *Birnbaum*.

Therefore, plaintiff's second contention must be considered, that is, that plaintiff is a "purchaser" within the scope of the *Birnbaum* rule. Plaintiff submits that the original joint venture and defendant's offer to Unit of fifty percent of the stock of the corporation to be organized was a "sale" of a "security" within Section 2 of the 1933 Act (15 U.S.C., Sec. 77b). Section 2 of the 1933 Act defines the term "sale" to

"include every contract of sale or disposition of a security or interest in a security for value."

The term "security", in turn, is defined as

"any note, stock, treasury stock, bond, debenture, evidence of indebtedness, cer-

tificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investments, voting-trust certificate, certificate of deposit for a security * * * or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing."

Applying these definitions to the facts of the present case, Unit contends that the joint venture agreement, calling for fifty percent stock issuance to Unit in the corporation to be formed, is a "contract of sale" and that there is a preorganization subscription amounting to a "security".

In support of this contention, plaintiff notes the case of Stevens v. Vowell, 343 F.2d 374 (10th Cir. 1965). It was there held that an agreement to form a corporation, which expressly provides for the distribution of shares of stock in the corporation to be thereafter formed, whether it be considered an investment contract, a contract for the distribution of shares of corporate stock or a joint venture agreement, is a contract to buy, purchase or otherwise acquire those shares of stock. The *Stevens* Court further held that such an agreement to form a corporation comes within the definition of a "security" as a preorganization certificate or subscription. Thus, the plaintiff can establish a "contract of sale" if it can prove that a joint venture agreement was formed on October 15, 1969 which included a fifty per cent stock issuance to Unit.

■ A "purchaser" of securities is defined as "one who was a party to a transaction whereby he was to assume ownership of securities in exchange for valuable consideration". Supt. of Insurance of the State of New York v. Bankers Life and Casualty Co., 300 F.Supp. 1083, 1098 (S.D. N.Y.1969), aff'd 430 F.2d 355 (2d Cir. 1970), rev'd on other grounds, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971).

There is sufficient evidence to raise a genuine issue of material fact as to whether Unit was a purchaser.

Further, it must be considered whether there is a genuine issue of material fact in regard to "fraud" in the offer or sale of a security. It should first be noted in this regard that it is not necessary to establish all of the elements of common law fraud to prove a violation of Section 17(a) of the Securities Act of 1933. See Globus v. Law Research Service, Inc., 418 F.2d 1276 (2d Cir. 1969).

As will be discussed below, since this Court does not grant summary judgment as to the common law action of fraud, it cannot hold that proof of fraud is impossible for Section 17(a) purposes.

Finally, KFC argues that the facts in the record of this case establish that Unit cannot recover damages under Section 17(a) since the transfer of stock was never consummated. Thus, it is argued that there are no damages within the "out of pocket" Federal rule.

■ It should be noted, however, that Congress chose to use the words "offer" or "sale" when enacting Section 17(a). By the inclusion of the term "offer" it appears that Congress intended to protect against mere "offers to sell" as well as actual "sales". A consummated sale need not be shown as long as damages can be proved. Since there is sufficient evidence surrounding the efforts of Unit after the October 15, 1969 meeting to raise an issue as to damages, the fact that an actual sale was not consummated is not determinative.

In summary, there is a genuine issue of material fact as to Unit's cause of action under Section 17(a) of the Securities Act of 1933.

The second question for this Court's determination is defendant's motion for summary judgment on the breach of contract issue. The plaintiff, as stated in its complaint, alleges that on or about October 15,

1969, Unit and KFC entered into a joint venture agreement which was further amplified by an agreement of October 30th for the sale of KFC real property through the joint venture for a sum in excess of $20,000,000.00 with any excess going to the joint venture. The plaintiff contends that KFC has breached this contract by its termination of the joint venture agreement, and that Unit has suffered damages as a result thereof.

■ Before getting to the heart of the determination which this Court must make, the subsidiary matter of which jurisdiction's law is to be applied must be considered. Under Delaware's choice of law rules, which are applicable here since the action has been brought in the courts of Delaware, the law of the place of making the contract determines whether or not it is enforceable. See Itek Corporation v. Chicago Aerial Industries, Inc., Del.Supr., 248 A.2d 625 (1968); and United Aircraft Corp. v. Paul Hardeman, Inc., 8 Storey 66, 204 A.2d 396 (Del.Super.1964). Thus, the law of Kentucky is to be followed in determining the validity and construction of the alleged contract between Unit and KFC since if an agreement was reached between the parties such would have occurred during a meeting of the parties held in Kentucky on October 15, 1969. Also, the letters of October 15 and October 30 on which the plaintiff relies were signed and delivered in Kentucky.

This Court must, therefore, look to the law of Kentucky to determine initially whether or not under any provable facts there is an enforceable contract between Unit and KFC since the *sine qua non* of a joint venture is a contract, express or implied. See 46 Am.Jur.2d, Joint Ventures, § 8. However, it must be noted that a contract to form a joint venture and the formation of a corporation to carry out the joint venture are two distinct entities. The vital issue to be considered is whether Unit and KFC formed a binding contract as to a joint venture for the building, financing and owning of KFC "Fast Food Services" by their discussions of October 15, 1969. The "Organization Agreement", the purpose of which was to form a corporation to carry out the alleged joint venture, is relevant only as to the intent of the parties. Also the question of whether there was an enforceable agreement for the sale of land is chiefly relevant only as to damages once the initial joint venture agreement can be shown to have been legally binding and breached. In short, the vital issue is whether a joint venture was entered into on October 15, 1969.

■ Since the joint venture was to deal with real property, the initial question is whether it complies with the Statute of Frauds. As to the question of the applicability of the Statute of Frauds to joint ventures dealing with real property, it has been noted that:

> "the courts generally draw a clear distinction between oral contracts for the sale, transfer or creation of an interest in real property and a partnership or joint adventure to acquire, sell and deal in real estate."

See Dayvault v. Baruch Oil Corp., 211 F. 2d 335, 339 (10th Cir. 1954). The latter is considered to concern personalty and is, therefore, not within the statute. This general rule appears also to be the law of Kentucky since it was specifically held in Eubank v. Richardson, 353 S.W.2d 367, 369 (Ct.App.Ky.1962) that a joint venture agreement for acquisition of realty is not within the statute of frauds concerning realty. Kentucky Revised Statutes (KRS), Section 371.010(6).

■ Defendant also points to KRS, Section 371.010(7) which reads:

> "No action shall be brought to charge any person: * * *

> "(7) Upon any agreement that is not to be performed within one (1) year from the making thereof; * * *."

and concludes that the contract under consideration is thereby unenforceable. However, the statute continues:

> "unless the promise, contract, agreement, representation, assurance, ratification, or some memorandum or note thereof, be in *writing* and *signed* by the party to be charged therewith, or by his *authorized agent*." (Emphasis added)

The letter of October 15, 1969 signed by Mr. Curlin would appear for summary judgment purposes to be an appropriate memorandum taking the agreement from the statute.

Since the present transaction does not come within the statute, it will be enforceable if proved. As to proof, parol evidence will be admissible. Fannin v. Williams, 231 Ky. 392, 21 S.W.2d 482, 483–484 (Ct.App.Ky.1929). There it was urged by the appellant that his motion for a directed verdict should have been sustained because the writing upon which the plaintiff's action was based was indefinite, incomplete and insufficient to support a judgment without the introduction of parol evidence. The Court said:

> "The action, however, is not based on the writing. The entire agreement between the parties is set out in the petition and the writing is merely referred to as evidentiary of a part of the contract. . . . While parol evidence is inadmissible to vary or contradict the terms of a written contract, this rule does not apply where the writing only purports to express part of the contract, or is expressed in such incomplete terms as to be unintelligible."

Fannin v. Williams, *supra* at 21 S.W.2d at 483–484.

The petition in the present transaction likewise does not purport to be the entire contract but merely evidence of a contract. Thus, parol evidence will be admissible. Anno. Parol Evidence, Rule of Integration, 70 A.L.R. 752.

With the above subsidiary issues determined, the major issue becomes whether the defendants have met their burden on summary judgment to show that no agreement was entered into between Unit and KFC. The issue to be resolved is the existence or non-existence on October 15, 1969 of an enforceable agreement.

The defendant contends that there was no actual agreement to form a joint venture on October 15, 1969 and an agreement was only to be achieved after a formal document was drafted and executed by both parties. The plaintiff, on the other hand, contends that actual agreement was reached and that any formal documents were only for the purpose of putting in written form what the parties had already contracted.

■ Under Kentucky law, the mere fact that the oral contract was to be afterwards reduced to writing does not render it unenforceable unless the parties intend that it not be binding until it is reduced to writing. See Tucker v. Pete Sheeran Bro. & Co., 155 Ky. 670, 160 S.W. 176, 178 (Ct. App.Ky.1913). Further, it has been established under Kentucky law that:

> "If two persons enter into a verbal agreement about a matter as to which an enforceable parol contract can be made, it would be no defense, when one of them is sued for a breach of contract, that he understood it would not be obligatory unless reduced to writing." See Dohrman v. Sullivan, 310 Ky. 463, 220 S.W.2d 973, 975 (Ct.App.Ky.1949).

Thus, if it can be found that the terms of the contract had been mutually agreed to, and that the parties then made a further agreement to write and sign a paper merely evidencing those terms, the contract is valid without the writing. This determination, that is, whether the parties become bound before the execution of the formal agreement, turns on the intent of the parties and must be determined by a consideration of the surrounding circumstances.

In examining the record before the Court, there appears to be conflicting testimony concerning the intent of the parties, and the affidavits, letters, etc. are likewise inconclusive. Thus, there is sufficient evidence presented to raise a genuine issue of material fact as to the intent of the parties to be bound on October 15, 1969.

Finally, there is sufficient evidence to raise a genuine issue of material fact as to damages incurred by Unit. Plaintiff has presented evidence as to damages suffered in reliance upon the alleged joint venture as well as some evidence as to expectancy to preclude KFC's motion for summary judgment.

KFC's motion as to the breach of contract claim is denied.

The third allegation by Unit of common law fraud is based on claims that the defendants never had any intention of fulfilling their agreement with Unit or of accepting any financing offered by Loeb-Rhoades and that Unit was used solely to shop KFC stock to investment bankers and to arouse interest in a proposed KFC stock issuance.

The first issue relevant to a determination of this question is what state law is applicable. In accordance with the holding of Friday v. Smoot, 8 Storey 488, 211 A.2d 594 (1965), this Court must apply the law of the place of wrong. Thus, in an action for fraud the law of the jurisdiction where the false material representation occurred must be applied. (11 Am.Jur., Conflicts of Laws, § 182). In the present situation, therefore, the law of Kentucky must be applied since it is there that the alleged agreement to form a joint venture, and the alleged agreement for the sale of KFC properties was entered. Thus, if as the plaintiff contends, the defendants never had any intention of fulfilling these agreements, such fraudulent intent would become actionable and the wrong would have occurred at the time and place of the alleged misrepresentation. The law of Kentucky must therefore be applied.

The essential elements of actionable fraud in Kentucky as recently stated in Scott v. Farmers State Bank, 410 S.W.2d 717, 720 (Ct.App.Ky.1966) are:

"material representation, falsity, scienter, or recklessness, intention, reliance, deception, and injury."

Prosser more clearly recites these elements as follows:

"1) A false representation made by the defendant * * *.

2) Knowledge or belief on the part of the defendant that the representation is false or that he has not a sufficient basis of information to make it. This element often is given the technical name of 'scienter'.

3) An intention to induce the plaintiff to act or to refrain from action in reliance upon the misrepresentation.

4) Justifiable reliance upon the representation on the part of the plaintiff in taking action or refraining from it.

5) Damage to the plaintiff, resulting from such reliance."

Prosser, Law of Torts, § 105 (4th Ed. 1971)

The defendants assert that there is not genuine issue as to KFC's intention to accept financing for their real properties since (as stated in their supplemental answer to interrogatory No. 22) they accepted a mortgage loan early in 1970. This, it is alleged, clearly refutes Unit's claim of no intent to accept financing. This showing is not sufficient in this Court's opinion to meet the defendants' burden since what KFC did several months after the original transaction under consideration does not clearly prove what its intent was at the time of the alleged fraudulent occurrence.

The defendants further suggest that there could be not fraud in the absence of the finding of an agreement. The defendants conclude that no such agreement exists and therefore no fraud was possible. But, as determined above, there is a question of fact as to whether an agreement exists.

The defendants next state that no fraud could exist since no financing was actually proffered by Loeb-Rhoades. But again the defendants must show that there is no genuine issue as to a material fact as to their intent at the time of the alleged misrepresentation. Moreover, summary judgment cannot be granted on this issue since the plaintiff has presented sufficient evidence by the testimony of Messrs. Morris and Cohn to raise a genuine issue of material fact. Mr. Morris testified in his deposition and in an affidavit that he had a firm verbal commitment from Loeb-Rhoades, and Mr. Cohn testified in an affidavit that Loeb-Rhoades was firmly committed to the financing and that interim financing would be available if necessary.

The next argument is that Unit could not have been mislead by any representations made by KFC representatives since (1) Morris knew that KFC was dealing with others from the start by a call from Mr. Curlin (KFC) to Mr. Herrington (Unit) of October 21, 1969 concerning talks with Prudential Insurance Co.; and (2) Morris knew of discussions with Lehman Brothers (Morris Deposition p. 70). If such were truly known, it is argued that Unit, or more particularly Morris, could not have been deceived.

As to the Curlin conversation, it is clear from the memorandum that Mr. Herrington understood that an offer had been made to the Prudential Insurance Company of America for the sale of KFC real estate holdings. However, the waters are muddied by Mr. Morris' testimony in his deposition taken by the defendants. Therein Mr. Morris testified that he met with Mr. Curlin and representatives of Prudential as early as August, 1969 to discuss financing of a hotel complex of Unit's in which Mr. Brown was to be an investor. At these meetings, financing of various other projects of KFC, namely hotel and fast food operations, was also discussed. As a result, it is unclear as to what the above memo mentioning Prudential concerned and factual questions exist as to Unit's knowledge.

As to the allegation that Morris knew of the dealing with Lehman Brothers, again, a question of fact is raised by the testimony of Mr. Morris in his deposition taken by the defendants. There Mr. Morris testified that Curlin led him to believe that KFC was completely dissatisfied with Lehman and was to seek another mortgage banker. This again raises a question of fact which cannot be appropriately determined in a motion for summary judgment. (Morris Dep. p. 60).

Finally, the defendants argue that there is no evidence of touting of KFC stock, and, absent such, the claim for common law fraud must be dismissed. The defendants present an affidavit of Edward E. Ellis, and the depositions of Mr. Woodfin and Mr. Barbanell. If touting is the issue, there are factual questions.

Mr. Ellis' sworn statement is to the effect that the "Third Quarter Report to Shareholders of Kentucky Fried Chicken Corporation, For the Nine Months Ended June 30, 1969" was publicly released on August 8, 1969. Taking this fact as true, it is not sufficient to meet the defendant's burden since financial data not included in this statement was also given to Loeb-Rhoades. This additional data may be the basis on which KFC's stock could be shopped, and, therefore, this point involves a question of fact.

The testimony of Messrs. Woodfin and Barbanell concerning touting are also open to conflicting conclusions. Of most significance is the fact· that the members of Loeb-Rhoades· continued to meet with KFC after the proposed deal was off, began to

recommend KFC stock in early 1970, and continued to receive inside information in late 1970, at a time when the KFC proposed transaction had been terminated. [KFC's answers to plaintiff's interrogatories 31(i) and 33(d)].

One issue remains concerning lack of proof of damages. The defendants generally assert that no damages can be proved by Unit even if a misrepresentation is found. This general assertion is not sufficient to meet defendants' burden, and is rebutted by the same damage evidence presented to support the contract claim. On the common law fraud count summary judgment is denied.

The defendants in the present action have counterclaimed. They seek damages for abuse of process and tortious interference with their business relationships. The plaintiff has moved for summary judgment in regard to these claims.

In regard to the claim for abuse of process, Prosser states that the essential elements of the tort are: 1) an ulterior purpose; and 2) a wilful act in the use of the process not proper in the regular conduct of the proceedings. In explaining these elements, Prosser notes that some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process, is required. Merely carrying out the process to its authorized conclusion, even though with bad intentions, does not result in liability. Some form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, must be shown. Prosser, Law of Torts, § 121 (4th Ed.1971).

In stating their claim for abuse of process, the defendants allege that the plaintiff knew or should have known that the grounds on which it sought relief had no basis; and that Unit brought suit in this Court only to embarrass the defendants through the Foreign Attachment Statute and to avoid having to litigate the case in a more convenient forum.

In support of its motion for summary judgment, the plaintiff submitted the affidavit of Mr. Morris. Therein, Morris denied that this suit was brought for any other purpose than to obtain proper redress. He stated that he had made his intent to enforce the legal rights of Unit clear to Messrs. Curlin and Brown as early as December 18 and 24, 1969 in letters sent to them. As a result, Mr. Brown, according to Mr. Morris' sworn statement, offered a compromise, but this arrangement was refused since Unit demanded fulfillment of the original agreement. Failing the fulfillment of this demand, Unit, after becoming aware that KFC was making authorizations for the sale of its property in a manner similar to the negotiations it had had with Unit, authorized the filing of this suit. The reason for filing when it did is stated to be the result of legal advice to do so. The Delaware Attachment Statute was to be used in obtain jurisdiction over Mr. Brown since he owned stock in KFC, a Delaware corporation. This means would be lost if the proposed merger with Heublein, Inc., was completed since Heublein was a Connecticut corporation and Mr. Brown's KFC stock was to be converted into shares of Heublein. On this advice, Unit filed suit. Finally, Mr. Morris in his affidavit states that the suit was not in force a settlement since settlement had already been offered and rejected. The only reason for the action was to enforce the contract which Unit had with KFC.

 In opposition to the motion, the defendants argue that the suit could have been brought in Federal Court if the plaintiff so chose. This may be true, but it does not show any facts from which it can be concluded that the plaintiff abused the process of this Court. This Court does have jurisdiction over all the claims which the plaintiff actively asserts[1]; the actions are at least colorable; the Foreign Attachment Statute was an appropriate and avail-

---

1. The Securities Act claim is justified by. the Section 17(a) allegation.

able legal resource; and, most importantly, the mere filing of a lawsuit, even with bad intentions, is not sufficient to prove abuse of process.

The defendants also point to a letter from Mr. Cohn to Mr. Morris dated December 22, 1969, the relevant portion of which follows:

> "It is my opinion that you should attempt to meet with Brown and work out some 'face-saving' arrangements. Brown may find it entirely to his benefit to: (1) obtain a concession from you; (2) avoid an extremely embarrassing lawsuit from Unit; (3) make a deal with Loeb-Rhoades on a highly attractive basis."

The defendants contend that this statement amounted to a suggestion to Mr. Morris of a strike suit to force the defendants into a settlement.

Even if the above is read as the defendants suggest, it is not sufficient to raise an issue of material fact since it does not show a threat or act in the use of process not proper in the regular conduct of a lawsuit. There is no issue of material fact as to abuse of process.

Summary judgment is granted to Unit.

The last question which must be considered and ruled on is the plaintiff's motion for summary judgment on the defendants' counterclaim for tortious interference with KFC's business relationships. The defendants contend that the plaintiff has interfered with defendants' business relations by filing the complaint in this action alleging that KFC had no intention of fulfilling its agreement with Unit and its only purpose was to shop KFC stock. This charge apparently is specifically based upon the fact that Unit filed its suit within three weeks of the publicly announced closing date of the merger (some eighteen months after the cause of action accrued). There

may be some broader aspects to the claim as well.

The applicable law as to tortious interference with business relations was recently reviewed by Chancellor Duffy in Bowl-Mar Company v. Brunswick Corporation, Del.Ch., 297 A.2d 61 (1972). At 297 A.2d 64 the Court cited the Restatement of Torts, § 766 (1939) which states:

> " * * * one who, without privilege to do so, induces or otherwise purposely causes a third person not to
>
> (a) perform a contract with another, or
>
> (b) enter into or continue a business relation with another
>
> is liable to the other for the harm caused thereby."

The Court at 297 A.2d 65 also cited 45 Am.Jur.2d Interference, § 50 to the following effect:

> "The basic elements which establish a prima facie *tortious interference with a business relationship* are the existence of a valid business relation (not necessarily evidenced by an enforceable contract) or expectancy; knowledge of the relationship or expectancy on the part of the interferer; an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted."

■ Much of the argument between the parties in regard to this cause of action has centered on the question of damages with Unit suggesting that the defendants themselves say there was no damage. Damages indeed may be difficult to prove but the lack of precise damages would not justify summary judgment. 45 Am.Jur.2d, Interference, § 57. The real question is one of privilege.

The Restatement of Torts, § 773 (1939) provides:

> "One is privileged purposely to cause another not to perform a contract, or enter into or continue a business relation, with a third person by in good faith asserting or threatening to protect properly a legally protected interest of his own which he believes may otherwise be impaired or destroyed by the performance of the contract or transaction."

The concept of privilege appears to have two levels, absolute and qualified. Absolute rights, including primary rights incident to the ownership of property, rights growing out of contractual relations, and the right to enter or refuse to enter into contractual relations, may be exercised by proper means without liability for interference without reference to one's motive as to any injury directly resulting therefrom. 45 Am.Jur.2d, Interference, § 23; Diver v. Miller, 4 W.W.Harr. 207, 148 A. 291 (Super.Ct.1929). Whether a party acted in the exercise of an absolute right may be a question of law or a question of fact. 45 Am.Jur.2d, Interference, § 23. In this case, there is certainly a factual question as to the very existence of plaintiff's contract right and it cannot be said on summary judgment that an absolute privilege must prevail.

Turning to qualified privilege or justification, the privilege to assert a claim will prevail only when the actor "in good faith" asserts "an honest claim". Prosser, Law of Torts, (4th Ed.1971) § 129, p. 945. So the real question in this cause of action is whether or not there is a genuine issue of fact concerning the good faith assertion of an honest claim by the plaintiff.

The summary judgment question is not necessarily answered by the fact that this Court has held that the plaintiff's claims themselves survive summary judgment. There is a question of credibility and the plaintiff's claims, while raising an issue of fact, may not, insofar as they rely on the testimony of plaintiff's agents, be based on truth. So the question at this stage must be judged viewing the facts most favorably for the defendant, including questions of credibility and good faith.

■ Eliminating the subjective factor, it does seem clear from undisputed objective facts, such as meetings, letters, and legal documents, that the plaintiff's claims are not frivolous and meet the requirement of a good faith assertion of an honest claim. If there is a bona fide doubt in regard to the nonexistence of the cause of action, there is justification. Hardin v. Majors, 246 S.W. 100 (Ct. of App. of Tex.1922). Since the plaintiff is acting in the proper exercise of a legal right, it does not matter if it is also motivated by ill will. Elvington v. Waccomow Shingle Co., 191 N.C. 515, 132 S.E. 274 (1926).

There is no genuine issue of material fact as to the claim of tortious interference. Plaintiff's motion for summary judgment is granted.

In summary, defendants' motion for summary judgment is denied as to all three causes of action. In so denying the motion, the Court notes that it has not been specifically briefed as part of the motion that defendant Brown has a different legal position than the defendant KFC, as well he might, particularly on the contract claim, and this denial is without prejudice to the defendant Brown to raise such individual defenses. The plaintiff's motion for summary judgment is granted as to both causes of action contained in the counterclaim. It is so ordered.