**Jeff FEINMAN and Consuela Feinman, Plaintiffs,**

v.

**BANK OF DELAWARE, Defendant.**

**Civ. A. No. 88–617 LON.**

United States District Court,
D. Delaware.

Jan. 17, 1990.

Douglas A. Shachtman, Wilmington, Del., for plaintiffs.

Jeffrey S. Welch, of Ashby, McKelvie & Geddes, Wilmington, Del., and Frank N. Broujos, Jr., Bank of Delaware, Wilmington, Del., for defendant.

## OPINION

LONGOBARDI, Chief Judge.

The Plaintiffs, Jeff and Consuela Feinman, allege that the Defendant, Bank of Delaware, violated their rights under the Electronic Fund Transfers Act, 15 U.S.C. §§ 1693a–1693r (1982) (the "Act") because the Defendant allegedly wrongfully denied them access to their money through automated teller machines ("ATM"). The Defendant has counterclaimed alleging that the Plaintiffs' actions amount to an abuse of process. The following constitutes the Court's findings of fact, conclusions of law and final decision based on the trial of the issues.

During the months of February and March, 1988, the Plaintiffs maintained a Big Plus Account (the "Account") with the Defendant. The Account included an interest-bearing checking account and a savings account. Withdrawals, deposits and other transactions could be made through ATMs pursuant to the terms of the Account. The terms and conditions of the Big Plus Account were disclosed in an initial disclosure statement from the Defendant. Docket Item ("D.I.") 45 at PM–91. From an accounting standpoint, the Plaintiffs had experienced difficulty in balancing their finances with the Defendant. In the fourteen months from January, 1987, through February, 1988, the Plaintiffs had overdrawn their checking Account eight times.

On Friday, February 19, 1988, the Plaintiffs caused their Account to be overdrawn by an amount in excess of $100.00. On Monday, February 22, 1988, Bonnie Ardis, who was the Junior Return Items Specialist employed by the Defendant, was given notice of the overdraft from the Defendant's computer.[1] Ms. Ardis decided to place a "deny cash" (also called a "deposit only") restriction on the Plaintiffs' Account. The effect of this restriction was to deny all access by the Plaintiffs to cash by use of an ATM. The Plaintiffs retained the ability to access their funds in other ways, for example, by cashing a check with the Defendant's tellers directly. The restriction was actually placed on the Plaintiffs' Account on Thursday, February 23, 1988. The criteria utilized in deciding to restrict Account privileges was based upon (1) the history of the account, (2) the customer's overdraft protection, (3) the number of overdrafts caused by the customer in the preceding twelve months, and (4) the particulars of how the overdraft was made (*i.e.*, whether ATM withdrawals figured into the overdrafts). D.I. 45 at PM 4–5, 20–21. Whether a customer deposits funds into his account *after* the overdraft has been made is *not* a factor in the decision to restrict an account because the Defendant is concerned with the history of the account up to the time the *decision* to restrict is made. D.I. 45 at PM–23.

The Plaintiffs' did have overdraft protection on their Account. Overdraft protection would permit the Defendant to automatically transfer funds from the Plaintiffs' savings account to their checking Account to cover overdrafts. ATM overdrafts, however, create a security risk for the Defendant that is not present with an

1. Ms. Ardis was trained and supervised by Elizabeth Trelenberg and was taught how to process, close and research overdrawn accounts. D.I. 45 at PM–3. Ms. Ardis was considered by her supervisors to be capable of deciding on her own whether to place "deny cash" restrictions on overdrawn accounts at the time she placed the restriction on the Plaintiffs' Account. *Id.*

overdraft created by a written check. If the overdraft is by check, the Defendant could return the check and bring the account back to a positive balance. If the overdraft is by ATM withdrawal, then "the customer has already got the money.... [The Defendant] cannot do anything to bring this account back to a positive balance." D.I. 45 at PM–21. It would be possible for the Plaintiffs to have withdrawn up to $500.00, the daily limit on ATM withdrawals, in the absence of a "deny cash" restriction. D.I. 45 at PM–8. Ms. Ardis testified that the February 19th overdraft was caused by four checks that were presented to the Defendant that day for payment and two ATM cash withdrawals by the Plaintiffs that day. D.I. 45 at PM–31–32. Ms. Ardis also testified at trial that the decision she made to restrict the Plaintiffs' Account in February of 1988 was correct and that the Defendant would make the same decision again based on these facts. *Id.* at PM–34. Larry Hamm, an Assistant Vice–President of the Defendant, in charge of Electronic Banking Services, testified at trial about the security risk presented by the Plaintiffs' situation. He testified that when a customer has overdrafts caused by ATM withdrawals and they have overdraft protection, in such instances, the ATM computers cannot read the customer's account balance. This situation, in Hamm's opinion, would affect the security of the system. If the Defendant were not to stop the electronic fund withdrawal in that situation, Hamm testified that the Defendant "would suffer the loss." D.I. 45 at PM–59.

The Defendant had a policy not to notify the customer in advance of placing a "deny cash" restriction on ATM privileges when the reason for the restriction was a valid security risk. Once the restriction is put on ATM privileges, the Defendant waits for the customer to contact the Defendant. At that time, the Defendant explains to the customer why the restriction was entered and counsels the customer on the proper use of the ATM privilege. D.I. 45 at PM–7–8. Because the Plaintiffs' restriction

was not considered permanent, it was eventually removed. Larry Hamm also testified that in the situation presented by the Plaintiffs' Account, the Defendant would not send out prior notice before placing the "deny cash" restriction. D.I. 45 at PM–61.

It is stipulated that the Plaintiffs attempted to withdraw funds by ATM eight times between February 28, 1988, and March 1, 1988. D.I. 39 at ¶ 8. On each of these occasions, the Plaintiffs were denied access because the "deny cash" restriction was still in effect. It is disputed whether any attempts were made on Saturday, February 27th, one of the occasions the Plaintiffs allege to have suffered damages. The Plaintiffs testified that Jeff Feinman made ATM access attempts in Philadelphia on the night of February 27th and that he was unable to withdraw money from his checking Account at those times. D.I. 45 at AM–89–90, AM–54. Larry Hamm testified that the Defendant receives a report from Mellon Bank (the Cashstream coordinator) of all attempted ATM transactions. D.I. 45 at PM–79. These records do not show any attempts to access the Account on February 27th. Hamm further testified that "if the machine [ATM] was not operational or not at the time connected to Cashstream ... [or] if Cashstream did not get the message, it would not appear on this record at all." D.I. 45 at PM–79. The Court finds that at least one attempt to withdraw cash from an ATM was made by Jeff Feinman on February 27th or 28th to support the Plaintiffs' claim that their rights under the Act were violated.[2]

On February 29, 1988, at the Plaintiffs' request, an attempt was made to restore the Plaintiffs' ATM cash withdrawal privileges. At the time, the Plaintiffs had a positive Account balance. The Defendant's records show that on Monday, February 22, 1988, there was a positive balance in the Plaintiffs' checking Account of $397.76. Ms. Ardis testified that she treated the Plaintiffs' Account the same as any other account. D.I. 45 at AM–35. When she decided to place the restriction, Ms. Ardis

---

**2.** The number of attempts to withdraw cash from the ATM is really academic considering the disposition of the Defendant's liability for restricting ATM access privileges. *See infra.*

relied upon the overdraft notice copy which came to her from the Return Items Department of the Defendant the day after the prior days transactions. D.I. 45 at AM–32–33, PM–13–14. The deposit by the Plaintiffs to bring the Account up to the positive balance occurred sometime between Friday, February 19th, after 6:00 p.m. and before 3:00 p.m. on Monday, February 22nd. D.I. 45 at PM–36. Ms. Ardis testified that the overdraft upon which she based her decision must have occurred sometime prior to that time period. D.I. 45 at PM–36. On March 25, 1988, the Plaintiffs wrote the Defendant stating that the deposit occurred on Monday morning, February 22nd. D.I. 45 at AM–144. At trial, when questioned on the date, Jeff Feinman indicated that he was not sure which day, February 19th or the 22nd. D.I. 45 at AM–144–145. The bank statement indicates that the Account was credited on February 22nd. D.I. 45 at AM–86. The decision to restrict the Account was based on the overdraft notice. In making the decision to restrict ATM privileges, it was not the Defendant's practice to check for subsequent deposits into an overdrawn account because the facts necessary to decide to restrict the account have already occurred. D.I. 45 at PM–36. The Court finds that this positive balance was not indicated on the materials before Ms. Ardis when she decided to place the "deny cash" restriction on the Plaintiffs' Account and, under these circumstances, there was no legal responsibility to do so. While the restriction was not keyed into the computer until the next day by the Defendant's ATM Department, Ms. Ardis' crucial *decision* was made while the Account was in an overdraft status. Any subsequent deposits bringing the Account to a positive balance thereafter were not before Ms. Ardis and were not a factor for consideration.[3]

As indicated earlier, the Defendant attempted to release the restriction from the Plaintiffs' Account on February 29, 1988. The testimony of Katherine Ann Thornton,

who was the ATM Operations System Monitor at the time, indicates that she attempted to restore cash access to the Plaintiffs' Account on February 29th. D.I. 45 at PM–45. She testified that she also, "for some reason", restored it again on March 2, 1988. *Id.* at PM–46. Her testimony was that:

A: There could have been several reasons.

Q: Give us an example of one of the reasons.

A: It could have been an operator error.

Q: Meaning your error?

A: I was the operator at the time.

Q: Meaning you didn't do what, take it off one of the systems …?

A: The Perkin–Elmer [computer] or it could have been a key stroke.... [I may have h]it the wrong key and never actually took the block [restriction] off.

D.I. 45 at PM–47. Ms. Thorton based her testimony on computer printouts. Since the restriction was not removed on February 29th, the Plaintiffs again contacted the Defendant to remove the restriction on March 2nd. The restriction was removed by Ms. Thornton again on March 2nd. Larry Hamm, who was employed by the Defendant as an Assistant Vice–President in Charge of Electronic Banking Service, including the ATM Department, testified that the February 29th command to remove the "deny cash" restriction was not removed because "it was not properly processed." D.I. 45 at PM–71. Apparently, as the Defendant's records indicate, the deny cash restriction was removed from the Perkin–Elmer computer but, due to an error in processing, was not removed from the Host computer. D.I. 45 at PM–70. Because of this, the restriction remained on the Plaintiffs' Account until it was again "removed" on March 2nd.

Consuela Feinman testified that the Account disclosure agreement did not indicate that, in the event that the Account becomes overdrawn, the ATM privileges could be

---

**3.** Once the restriction decision is made, the Return Items Department calls the ATM Department to log the restriction onto the ATM computer system. The ATM Department follows the instructions of the Return Items Department with respect to the placing and removal of restrictions on customers accounts. D.I. 45 at PM–37–45.

frozen. D.I. 45 at AM–51. Her experience with the Account was that if it was overdrawn, the Defendant would notify her by mail and charge the Account a fee for the overdraft protection. D.I. 45 at AM–52, AM–85–86.

There is testimony in the record, however, indicating that the Plaintiffs did understand that if they overdrew their Account that the Defendant could reasonably be expected to "freeze" or restrict access to their Account. The following exchange took place at trial between the Court, Jeff Feinman (designated as "JF") and the attorney for the Defendant (designated as "Attorney").

Court: I think there is another purpose for the question and that has nothing to do with whether he is a legal expert or not, and that is, what does he expect from opening an account or closing an account, what does he expect when he overdraws or when he gets notice about overdraft. And that doesn't take a lawyer. He is a customer, and he is going to answer the question as a customer, and that is it, not as a lawyer.

\*       \*       \*       \*       \*       \*

[Court reporter reads the prior question:] "Question: So your hangup is they [Defendant] could have done it [placed the restriction] as long as they gave you notice, is that correct?"

JF: Yes. The bank had to give consumers, the customers, the notice that they intend to freeze the account or intend to close the account or intend to materially change the rights under the account.

Attorney: You were present when the bank witnesses testified this morning and you heard the one witness testify that when you have these overdraft privileges, the computer system is set up so that even though there is no money in your checking account, you use your ATM privileges, you can just keep getting money. Did you hear that?

JF: I did.

Attorney: Did you have any reason to disagree with that statement?

JF: No.

Attorney: So if the bank is sitting there with someone who keeps overdrawing their account and they have no money in their account, isn't it reasonable for the bank to put a hold on that whether there is a deposit latter or not?

JF: As long as there is a deficit in the account, yes, but once the account became positive, it is a whole—another story. . . .

Attorney: So your position, Mr. Feinman, is, you have a customer that let's say overdrafts his account 20 times and the bank is concerned about this, they are concerned that through the ATM card this bank customer is going to keep speiling out all this cash to these automatic tellers, whether in Philadelphia, New York, or Newark, once a deposit is made then everything is forgiven and you've got to let them take more money out? Is that your position?

JF: If the bank would have preferred to close my account or freeze my account, they had the responsibility to send me notice.

\*       \*       \*       \*       \*       \*

Court: That is his understanding as a customer.

D.I. 46A at A25–27.

Larry Hamm testified as to the disclosure provided to the Plaintiffs with respect to restrictions on Account use. He testified that the disclosure for the Account states that for certain security reasons there are limits on the Account. D.I. 45 at PM–56. Furthermore, where there is a valid security reason for a limitation or restriction, the disclosure indicates that prior notice will not be provided. D.I. 45 at PM–57. On the other hand, Item 1 of the "Additional Cashstream Terms" states that for *non*-security risk changes in limitations, terms and conditions on the Account, twenty-one days prior notice would be given to the customer before such changes become effective. D.I. 45 at PM–57.

At the beginning of the Account disclosure, there is a list of "transactions" available to the Plaintiffs through ATMs. These transactions include withdrawals of cash and deposits to the Account. Plain-

tiffs' Exhibit ("PX") 2. Larry Hamm testified that the agreement, which states that the Defendant "may permit additional types of transfers or *stop* types of transfer", refers to such transactions as withdrawals or deposits. D.I. 45 at PM–92 (referring to the "Additional Cashstream Terms" section of Agreement). The testimony indicates that read together, this disclosure would reasonably put a customer on notice that in the event that the Defendant were confronted with a security risk, the Defendant could limit the customer's ability to withdraw cash from their account through an ATM. D.I. 45 at PM–91–94. The Court finds that the agreement reasonably conveyed that if the Plaintiffs overdrew their Account the Defendant could restrict access to their Account from ATMs. The Court further finds that the Plaintiffs were reasonably on notice that in the event a security risk arose, the Defendant could restrict or limit the types of transactions that could be effected through ATMs. One of these transaction included cash withdrawals.

The Plaintiffs allege that they suffered damage due to the "deny cash" restriction placed on their Account by the Defendant. They allege their rights were violated by the Defendant's wrongful placing and maintaining of the restriction without prior notice. They argue that they suffered embarrassment and humiliation due to the Defendant's actions entitling them to statutory, actual and punitive damages together with an award of costs and attorney's fees.[4]

To support their allegations, Plaintiffs testified that they were aware that they had made sufficient deposits into their Account to give them a positive balance as of February 27th. They also testified that they were unaware of the restriction on their Account at that time. On Saturday, February 27th, the Feinman's drove to Philadelphia from their home in Newark, Delaware, to take their two children out for dinner. When they arrived in Philadelphia, they testified that the ATM from which they attempted to withdraw funds denied them access. Already having made plans for their night out and having already driven to Philadelphia, the Feinmans' decided that the only alternative left to them was to drive over to Jeff Feinman's brother's (the "brother") house to borrow money from him. The Plaintiffs testified they considered their financial matters personal and had never had to borrow money from the brother before. They testified they were embarrassed and humiliated to unexpectedly show up at his house to borrow money despite the fact that Jeff Feinman said he and his brother shared a close relationship and were "good friends." D.I. 46A at A–32. The Plaintiffs testified they had to suffer the jokes and teasing of the brother at their own expense. The next day, after they all spent the night at his brother's house, Mr. Feinman attempted to withdraw funds from several other ATM's in the area. D.I. 39 at ¶ 8. All denied him access due to the "deny cash" restriction. Upon returning to his brother's house, the Plaintiffs allegedly endured further teasing because of the inability to obtain the funds. The brother did not testify to corroborate the Plaintiffs' testimony. As previously indicated, Mr. Feinman contacted the Defendant on February 29th and again on March 2nd to remove the restriction from the Plaintiffs' Account.

## ELECTRONIC FUND TRANSFERS ACT

### Notice Under the Act

■ The Act addresses the financial institution's responsibility to notify the consumer with respect to certain changes to the consumer's account.

A financial institution shall notify a consumer in writing at least twenty-one days prior to the effective date of any change in any term or condition of the consumer's account required to be disclosed under subsection (a) of this section if such change would result in greater cost or liability for such consumer or decreased access to the consumer's account. A financial institution may, how-

---

4. The Complaint seeks the maximum statutory damages of $1,000.00 per violation of the Act

pursuant to 15 U.S.C. § 1693m(a)(1), (2), (3). D.I. 1 at § VI.

ever, implement a change in the terms or conditions of an account *without prior notice* when such change is immediately necessary to maintain or restore the *security* of an electronic fund transfer system or a consumer's account....

15 U.S.C. § 1693c(b) (emphasis added).[5] The security reason given by the Defendant for the restriction on the Plaintiffs' Account was, *inter alia,* that the Plaintiffs had overdrawn their Account by the use of ATMs in the past and presented a risk to do so in the future. Indeed, the reason for the February 19th overdraft was, in part, caused by the Plaintiffs' use of an ATM to withdraw cash. The fact that the Plaintiffs had overdraft protection on their Account would have allowed them to withdraw up to $500 in funds from an ATM per day even though their Account did not have a positive asset balance. Furthermore, the Plaintiffs were aware of this capability. D.I. 46A at A–26. Unlike an overdrawn check, the Defendant could not "return" the transaction to restore a positive balance. Because of this very real possibility of future attempts at overdrawing their Account by way of ATM withdrawals, as well as the other factors in the Defendant's decision, the Court finds that the Defendant reasonably concluded that there was a security risk at the time it decided to place the deny cash restriction on the Account. 15 U.S.C. § 1693c(b).[6] This determination that there was a security risk is based upon the facts of this case and the evidence presented to this Court with respect to Plaintiffs' Account. The Court makes no determination, in general, on the adequacy

of procedures and oversight policy of the Defendant.

Additionally, the Court finds that the restriction was not permanent.[7] The general policy of Defendant was to remove such restrictions upon contact by the customer. D.I. 45 at AM–42–43. (In most cases, the restriction would be removed if, after contact with the customer, the Defendant was reasonably satisfied that the customer would maintain a positive balance in the future.) This in fact occurred in this case. Furthermore, the agreement itself provided that limitations on use for security reasons would not be preceded by notice. Accordingly, the Defendant had no obligation to subsequently notify the Plaintiffs of the change in their Account.

### Financial Institution Liability Under the Act

■ It must next be determined whether the Plaintiffs have made their case with respect to the illegality of the "deny cash" restriction and the damages allegedly sustained. The Act provides for the liability of financial institutions, such as the Defendant, in certain instances. Section 1693h provides that "a financial institution shall be liable to a consumer for all damages proximately caused by ... the financial institution's failure to make an electronic fund transfer, *in accordance with the terms and conditions of an account,* in the correct amount or in a timely manner when *properly* instructed to do so by the consumer...." 15 U.S.C. § 1693h(a)(1) (emphasis added).[8] The liability of a finan-

---

5. Subsection (a) of section 1693c provides, *inter alia,* that disclosure to the consumer must include "in readily understandable language" "any limitations on the frequency or dollar amount" of electronic fund transfers. 15 U.S.C. § 1693c(a)(3).

6. The security risk posed by these facts is not entirely unlike the security risk posed by a customer who attempts to fraudulently inflate his account balance by putting an empty deposit envelope into the ATM deposit drawer. In that situation, if the account is credited with this fraudulent amount, and the customer withdraws from his account based thereon, the financial institution could suffer serious losses. Procedures have been implemented to avoid such occurrences. Where an account has over-

draft protection, the customer could also withdraw large sums of money from an ATM where the customer did not actually have the funds available in his account for withdrawal. In such a situation, the financial institution is also subject to losses due to fraudulent or other attempted ATM withdrawals. D.I. 45 at PM–58–59.

7. The Act requires subsequent notice for certain "permanent" security risk changes to the account. *See* 15 U.S.C. § 1693c(b).

8. Subsection (c) to section 1693h provides that:
   In the case of a failure described in subsection (a) of this section which was not intentional and which resulted from a bona fide

cial institution under section 1693h is expressly limited by the "terms and conditions" of the account. Under the terms and conditions of the Plaintiffs' Account with the Defendant, one of the "Limitations on Use" was that "[f]or *security reasons*, there are other limits on the transactions you [ (i.e., Plaintiff) ] can make using your Cashstream card." PX–2 (emphasis added). The "Additional Cashstream Terms" provided that the Defendant did "not need to give you [Plaintiff] prior notice where an immediate change is necessary for the security of our Cashstream system." *Id.* As previously discussed, Larry Hamm testified that the security risk limitation on use was to be read together with other provisions in the Initial Disclosure. He referred to the "Additional Cashstream Terms" section that indicates the Defendant "may ... stop types of transfers." PX–2. Furthermore, he testified that the types of transfers that could be stopped were those listed on the front of the Initial Disclosure, including cash ATM withdrawals. The "Additional Cashstream Terms" section also stated that when immediate security changes are necessary, no prior notice is needed. Since the Court has determined that the Defendant had a valid security reason to justify the decision to place the deny cash restriction on the Account, there is a strong argument that the Defendant did *not* "fail[ ] to make an electronic fund transfer, in accordance with the terms and conditions" of the Account. 15 U.S.C. § 1693h(a)(1). The terms and conditions of the Account expressly disclosed that there were "other limitations" on ATM use based on "security reasons." PX–2. Technically then, there is sufficient evidence in the record from which the Court could conclude that the Defendant is not liable under section 1693h.

Regulation E, which implements the Act, provides that it was "intended to carry out the purposes of the Act, including, primari-

ly, the *protection of individual consumers* engaging in electronic transfers." 12 C.F.R. § 205.1(b). This language supports a liberal interpretation of the Act so as to carry out its purpose of protecting individual consumers such as the Plaintiffs. *Cf. Bisbey v. D.C. Nat. Bank*, 793 F.2d 315 (D.C.Cir.1986) (broadly reading the protections afforded consumers by section 1693m of the Act). While the Court is of the opinion that the Act should be liberally applied, the analysis of the instant controversy begins to cloud. The parameters of the rights and liabilities of the parties to electronic fund transfers, though addressed by statute and regulation, are jurisprudentially nascent. *Cf. Gaffney v. Community Federal Savings and Loan Association*, 706 S.W.2d 530 (Mo.Ct.App. 1986) (recognizing dearth of case law on the rights associated with ATMs).

The Court is concerned with the *adequacy* of the Defendant's disclosure with respect to security restrictions because the basis for the financial institution's liability under section 1693h(a) is conditioned upon the "terms and conditions" of the account. If the terms and conditions do not reasonably, in readily understandable language, inform the customer of the rights and liabilities agreed to, it would seem impossible to determine if the Defendant's failure was not in accordance with the terms and conditions. On the one hand, the Act requires that the terms and conditions of the account must be disclosed "in readily understandable language...." 15 U.S.C. § 1693c(a). Furthermore, such disclosures include, *inter alia*, "any limitations on the frequency or dollar amount of" ATM transfers, 15 U.S.C. § 1693c(a)(3); and the "right to make such transfers", 15 U.S.C. § 1693c(a)(4). On the other hand, the Act requires the Federal Reserve Board to "issue model clauses for optional use by financial institutions to facilitate compliance with the disclosure requirements of section

error, notwithstanding the maintenance of procedures reasonably adapted to avoid any such error, the financial institution shall be liable for actual damages proved.
15 U.S.C. § 1693h(c). This bona fide error exception to liability certainly does not apply to a

case such as this where the decision to deny cash placed on the Plaintiffs' Account was intentionally made by the Defendant for security reasons.

1693c of this title and to aid consumers in understanding the rights and responsibilities of participants in electronic fund transfers by utilizing readily understandable language." 15 U.S.C. § 1693b(b).[9] Furthermore, the Act provides that financial institutions that disclose in good faith compliance with the model disclosures provided by the Federal Reserve Board will not be liable to any consumer under sections 1693m (civil liability) and 1693n (criminal liability). 15 U.S.C. § 1693m(d).[10] Also, the Act recognizes the need for a financial institution to change the terms and conditions of an account for security reasons necessary to protect both the consumer and the financial institution. *See, e.g.,* 15 U.S.C. § 1693c(b).[11] And, as previously discussed, in the event of a security restriction, prior notice need not be given to the consumer. 15 U.S.C. § 1693c(b).

The Court has concluded, however, that the Initial Disclosure reasonably indicated that if the Plaintiffs overdrew their Account, the Defendant could restrict or close out their Account. While the Plaintiffs have testified that they did not understand the Initial Disclosure to allow the Defendant to restrict their ATM privileges without prior notice, as was done here, the Court finds that position unreasonable in light of its prior finding. The Plaintiffs' problem appears to have been their mistaken assumption that the Defendant in this case had a duty to notify them prior to restricting their ATM privileges. The disclosure statement itself indicates that no notice is required prior to imposing restrictions where there is a valid security reason. This Court has already found that a valid security reason prompted the Defendant's decision to restrict the ATM privileges on the Account. Thus, under the terms of the Account agreement and the Act, no notice was necessary prior to restricting the Account. Furthermore, while it is true that when the restriction was actually keyed into the computer system, the Plaintiffs' Account had a positive balance,[12] this Court

---

**9.** Appendix A—Model Disclosure Clauses, which is appended to Regulation E provides a similar limitation on use to that which was contained in the Account disclosure. The Model Disclosure states:

(b) *Limitations on frequency of transfers.*

(4) For security reasons, there are (other) limits on the number of transfers you can make using our (terminals) (telephone bill-payment service) (point-of-sale transfer service).

**10.** That section provides:

(d) No provision of this section or section 1693n of this title imposing any liability shall apply to—

(1) any act done or omitted in good faith in conformity with any rule, regulation, or interpretation thereof by the Board or in conformity with any interpretation or approval by an official of employee of the Federal Reserve System duly authorized by the Board to issue such interpretations or approvals under such procedures as the Board may prescribe therefor; or

(2) any failure to make disclosure in proper form if a financial institution utilized an appropriate model clause issued by the Board, notwithstanding that after such act, omission, or failure has occurred, such rule, regulation, approval, or model clause is amended, rescinded, or determined by judicial or other authority to be invalid for any reason.

15 U.S.C. § 1693m(d).

**11.** As required by Regulation E, the initial disclosure of terms and conditions must disclose "[t]he ... limitations on the frequency and dollar amount of transfers. The details of the limitations need not be disclosed if their confidentiality is essential to maintain the security of the electronic fund transfer system." 12 C.F.R. § 205.7(a)(4).

The Federal Reserve Board's Official Interpretation of this section is that:

The general rule is that information on these limitations must be disclosed in detail to consumers. This is so even if the limitations are related to the security aspects of the electronic fund transfer system. The regulation provides, however, that to the extent confidentiality of certain details is determined by the institution to be *essential* to the security of the account or the system, the details may be withheld—but the fact that there are limitations must be disclosed.

12 C.F.R., Part 205, Supp. II at Official Interpretation 7–11.

**12.** This would not amount to a violation of section 1693h(a)(2) of the Act. As this Court has already concluded, the important point of reference is the time the *decision to restrict* is made *not* whether the Plaintiffs' subsequently made their Account balance positive. Furthermore, the Plaintiffs were not denied access to their funds in their Account due to a failure by the Defendant to credit the Account. Rather, the denial of funds from the Account through an ATM was due to the security reason restriction.

has already concluded that the crucial event was the *decision* to restrict ATM privileges based on the information reasonably available at the time and *not* the physical event of keying the restriction into the Defendant's computer system. At the time the *decision* was made, the Plaintiffs' Account had previously been overdrawn, at least in part, by ATM withdrawals. While there may be situations where the time between the decision to restrict and the actual entry of the restriction into the computer is so great as to require a different result, this is not such a situation.

Section 1693h(a)(2) of the Act does not alter this result.[13] The Defendant did not fail to make an electronic fund transfer to the Plaintiffs due to a failure to credit a deposit. The basis of the restriction was that a security risk was posed by a pattern of overdrafts. D.I. 45 at PM–59, PM–4–5, PM–20, PM–31–34. Furthermore, the Defendant did not fail to credit the Plaintiffs' Account with the money that was deposited after the Defendant decided to restrict the Plaintiffs' Account. The Defendant's records show that the Account was in fact credited properly. D.I. 45 at PM–99; Defendant's Exhibit ("DX") 2. The fact that the funds were not available for ATM withdrawal was due to the security restriction not any failure to credit the Account in accordance with the terms and conditions of the Account agreement.

If section 1693h(a)(2) were interpreted to impose liability in a situation such as is presented by these facts, it would be tantamount to denying an institution the right to impose a valid security restriction. Under those conditions, an institution would be required to maintain a minute by minute review of all restricted accounts to become aware of a positive balance. This would impose an onerous duty upon the financial institution and would come at no small expense to the consumer.[14] It also would minimize the fact that the customer had improperly used his ATM privileges by overdrawing his account and subjecting the financial institution to future potentially significant losses. · Furthermore, it would defeat another laudable purpose behind the security restriction in this case. It would destroy the Defendant's opportunity to stop future improper ATM usage by the Plaintiffs because the opportunity to counsel them would be lost. The Act contemplates, as does the Account agreement in this case, that the Defendant should have the opportunity to protect itself and the Plaintiffs from security risks presented by situations such as this one. Accordingly, this Court reiterates that it is the decision to place a valid security risk restriction, based on the information reasonably available, that is important in this case not the events that occurred subsequently.

*February 29th to March 2nd*

■ On February 29th, Plaintiffs contacted the Defendant and requested that the restriction on their Account be removed. The ATM Department was instructed to remove the restriction on that day. The Court finds, by a preponderance of the evidence, that the restriction was not removed at that time due to either unintentional human error or a computer error. The restriction was subsequently removed on March 2nd when the Plaintiffs again complained and requested its removal. D.I. 45 at PM–75. This failure to remove the restriction coupled with the Plaintiffs' attempts to withdraw cash from the Account through an ATM, constitute a violation of section 1693h(a)(1). The Plaintiffs were denied access to their funds by way of electronic transfer due to the Defendant's failure to comply with the terms and

---

13. This section provides:
    (a) Subject to subsections (b) and (c) of this section, a financial institution shall be liable to a consumer for all damages proximately caused by—
    (2) the financial institution's failure to make an electronic fund transfer due to insufficient funds when the financial institution failed to credit, in accordance with the terms and conditions of an account, a deposit of

    funds to the consumer's account which would have provided sufficient funds to make the transfer....
15 U.S.C. § 1693h(a)(2).

14. The Defendant did not, in fact, have a mechanism in place whereby an account could be tracked for a positive balance. D.I. 45 at AM–39.

conditions of the Account agreement. D.I. 45 at AM–96–97. During this time period, the Defendant's security risk had been removed. There was a positive Account balance and the Defendant had the opportunity to counsel the Plaintiffs on the proper use of their ATM privileges.

Section 1693h(c) provides that "[i]n the case of a failure described in subsection (a) of this section which was not intentional and which resulted from a bona fide error, notwithstanding the maintenance of procedures reasonably adapted to avoid any such error, the financial institution shall be liable for actual damages proved." 15 U.S.C. § 1693h(c). The Court finds that the failure of the Defendant to remove the restriction timely was a bona fide error and was not intentional in spite of procedures reasonably adapted to avoid any such error. Accordingly, the Defendant is only liable to the Plaintiffs for actual damages proved during this time period.[15]

At trial, the attorney for the Plaintiffs stated: "Your Honor, the only evidence we have offered as to actual damages occurred in Philadelphia." D.I. 46A at AM–43, PM–106. The evidence also indicated that the Plaintiffs had to contact the Defendant to remove the restriction on two occasions (February 29th and March 2nd). There were no actual damages proved with respect to the short time period that the Plaintiffs took to contact the Defendant. Furthermore, the Plaintiffs retained the ability to access their funds by writing checks or through human teller withdrawals. D.I. 45 at PM–106. The Court finds that the Plaintiffs have failed to prove actual damages for the time period from February 29th to March 2nd.

## ABUSE OF PROCESS

■ The Defendant counterclaimed alleging that the Plaintiffs are liable for abuse of process. In order to sustain a claim for abuse of process, the Defendant must prove an ulterior purpose and a willful act in the use of the process that is not proper in the regular conduct of the proceedings. *Unit, Inc. v. Kentucky Fried Chicken Corporation,* Del.Super., 304 A.2d 320, 331 (1973). There must be "[s]ome definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of process ... there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion." *Stevens v. Independent Newspapers, Inc.,* Del.Super., Civil Action No. 85C–OC–11, slip op. at 23, 1988 WL 25377, Lee, J. (Mar. 10, 1988). To sustain the counterclaim, there must be some type of coercion involved, "such as the ... payment of money, by the [improper] use of process as a threat or a club" to obtain a collateral advantage. *Id.* at 24. "Merely carrying out the process to its authorized conclusion, even though with bad intentions, does not result in liability. Some form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, must be shown." *Unit,* 304 A.2d at 331.

■ The Defendant makes the following arguments in support of its counterclaim. It argues that the Plaintiffs' cause of action was "frivolous" and in fact "never" existed. D.I. 46 at 23. The Defendant argues that the various "demand" letters sent to the Defendant from the Plaintiffs demanding thousands of dollars on their claim and that the Defendant would incur large sums of attorneys fees if they had to contest the action supports its counterclaim. D.I. 46 at 24–25.[16] Because of this, the Defendant argues that the Plaintiffs

---

**15.** While the violation of section 1693h(a) would ordinarily require the Court to find the Defendant liable to the Plaintiffs under section 1693m(a), the Court is of the opinion that liability under the bona fide error provision of section 1693h applies. The language of section 1693m(a) supports this reading of the Act. Section 1693m(a), which imposes civil liability for failure to comply with any provision of the Act, imposes this liability *"[e]xcept as otherwise provided by this section and section 1693h* of this title...." 15 U.S.C. § 1693m(a) (emphasis added). This language means that if section 1693h provides for another measure of damages, it is that measure of damages that is to be awarded.

**16.** For example, on March 25, 1988, Mr. Feinman demanded a sum of $2,500.00 in cash from the Defendant to settle the matter. PX–5; D.I. 46 at 24.

had an extortionate purpose in filing the complaint in an attempt to coerce the Defendant into an unfavorable settlement of the Plaintiffs' demands. Furthermore, the Defendant argues that the Plaintiffs filed the complaint in retaliation to the Defendant's decision to close the Plaintiffs' Account.

The record proves that the Plaintiffs believed that they were wronged by the Defendant and sought to recover damages under the Act. Plaintiff Jeff Feinman testified that:

> due to the extent to which the bank had frozen our account and the manner in which they had frozen our account without any notice was a violation, my understanding at the time, was a violation of the statute and what we had gone through and lost that weekend with my family an emotional situation, the humiliation in front of my brother, my sister-in-law, the inconvenience that it provided and the statutory damages allowed under the law. But the Court will determine that.

D.I. 45 at AM–103. This Court has already recognized that the parameters of the rights and liabilities under the Act are not at all clear and that much of the Act has yet to be interpreted by the Courts. Indeed, the Act and Regulation E are of limited help in discerning the boundaries of such restrictions. The Court concludes that the Defendant has not shown that the Plaintiffs had an ulterior purpose in bringing this action. The discussion of the rights and liabilities of the parties to this action indicates that the suit was not frivolous.

The Court also concludes that the Defendant has failed to show a willful act in the use of process not proper in the regular conduct of these proceedings. The record shows that the Plaintiffs have engaged in legitimate discovery. The Plaintiffs' actions in proceeding through this lawsuit were proper. The fact that they were un-

able to establish the Defendant's liability does not amount to an abuse of process.

### CONCLUSION

To summarize, it is the conclusion of the Court that the Plaintiffs have failed to establish that the Defendant improperly restricted the Account without any prior notice on February 22, 1988. Accordingly, the Plaintiffs are entitled to no damages with regard to their inability to withdraw cash from their Account on February 27th up to February 29th. The Defendant did violate the Act with respect to its failure to remove the restriction on February 29, 1988, which caused the inability of the Plaintiffs to withdraw cash from their Account through an ATM. Because this failure was due to an unintentional bona fide error, the Plaintiffs are only entitled to actual damages proved for this violation. The Plaintiffs have failed to establish actual damages with regard to this violation by the Defendant. Accordingly, the Plaintiffs are not entitled to an award of damages. On the Defendant's counterclaim, because it has failed to prove an ulterior motive or a willful act in the use of process not proper in the regular course of litigation, the Defendant's claim for abuse of process is dismissed.[17]

---

**17.** The Defendant's motions for a directed verdict and dismissal of the Plaintiffs' claim for punitive damages are resolved in accordance

with the findings and conclusions of this opinion.