BILL LOCKYER Attorney General THOMAS S. LAZAR Deputy Attorney General
THE HONORABLE WESLEY CHESBRO, MEMBER OF THE STATE SENATE, has requested an opinion on the following question:
When a customer uses a debit card to purchase gasoline at a service station, may the service station owner cause a hold to be placed upon the customer's bank account before allowing the gasoline to be pumped where the amount of the hold is in excess of the purchase price of the gasoline ultimately pumped, the hold extends beyond the fueling event, and the owner does not inform the customer of the existence of the hold?
 CONCLUSION
When a customer uses a debit card to purchase gasoline at a service station, the service station owner may not cause a hold to be placed upon the customer's bank account before allowing the gasoline to be pumped where the amount of the hold is in excess of the purchase price of the gasoline ultimately pumped, the hold extends beyond the fueling event, and the owner does not inform the customer of the existence of the hold.
 ANALYSIS
We are informed that customers who use debit cards to purchase gasoline at service stations are often subject to "preauthorization holds" on their bank accounts in an amount determined by the service station owner. Because a retail sale of gasoline cannot feasibly be reversed, the amount of the hold is intended to be large enough to ensure that whatever amount of fuel is pumped, the customer will have sufficient funds to pay for the purchase. May the service station owner cause the placement of a hold by the issuer of the debit card without informing the customer of the hold's existence? We conclude that this business practice would violate California law.[1]
If the amount of the hold does not exceed the price of the gasoline that is ultimately purchased, or if the hold is immediately reduced to the amount of the purchase upon completion of the fueling event, the customer would have no need to know of the hold's existence. Indeed, we are informed that the placement of holds on behalf of service station owners is normally reversed when fueling is completed.
The duration of the hold is thus the critical factor to be considered when the hold exceeds the amount of the purchase price. No federal law (see 15 U.S.C. § 1693a- 1693r; 12 C.F.R. § 205.3 (2001); Feinman v. Bank of Delaware (D.Del. 1990) 728 F. Supp. 1105, affd. (3d Cir. 1990)909 F.2d 1475) expressly requires the disclosure of the existence of a hold placed on a debit cardholder's account.
However, under California's Unfair Competition Act (Bus. Prof. Code, §§ 17200-17208; "UCA"),[2] "any unlawful, unfair or fraudulent business act or practice" (§17200) is prohibited (§§ 17203
-17206). (See Perdue v. Crocker National Bank (1985)38 Cal.3d 913, 929; Community Assisting Recovery, Inc. v. Aegis Security Ins. Co. (2001) 92 Cal.App.4th 886, 891; South Bay Chevrolet v. General Motors Acceptance Corp. (1999) 72 Cal.App.4th 861, 877; Podolsky v. First Healthcare Corp. (1996) 50 Cal.App.4th 632, 647; State Farm Casualty Co. v. Superior Court (1996) 45 Cal.App.4th 1093, 1102-1104; 82 Ops.Cal.Atty.Gen. 233, 234-236 (1999).) In State Farm Fire Casualty Co. v. Superior Court (1996) 45 Cal.App.4th 1093, 1102-1104, the court explained the purposes of the UCA as follows:
"The statutory scheme of the UCA is straightforward. In section17200 of the Business and Professions Code (section17200) any `unlawful,' `unfair' or `fraudulent' business act or practice is deemed to be unfair competition. . . .
". . . Because section 17200's definition is disjunctive, a `business act or practice' is prohibited if it is `unfair' or `unlawful' or `fraudulent.' In other words, a practice is prohibited as `unfair' or `deceptive' even if not `unlawful' and vice versa. [Citation.] . . . .
". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
". . . [I]t is not necessary for a business practice to be `unlawful' in order to be subject to a UCA action. The `unfair' standard, the second prong of section 17200, also provides an independent basis for relief. This standard is intentionally broad, thus allowing courts maximum discretion to prohibit new schemes to defraud. [Citation.] The test of whether a business practice is unfair `involves an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justification and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim . . . [Citations.]' [Citation.] In People v. Casa Blanca Convalescent Homes, Inc. (1984) 159 Cal.App.3d 509, the court, acknowledging that the parameters of the term `unfair business practice' had not been defined in a California case, applied guidelines adopted by the Federal Trade Commission and sanctioned by the United States Supreme Court in FTC v. Sperry Hutchinson Co. (1972) 405 U.S. 233, 244 [31 L.Ed.2d 170, 179,92 S.Ct. 898]. The court concluded that an `unfair' business practice occurs when that practice `offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.' [Citation.]
"Examples of unfair business practices include: charging a higher than normal rate for copies of depositions transcripts (by a group of certified shorthand reporters), where the party receiving the original is being given an undisclosed discount as the result of an exclusive volume-discount contract with two insurance companies [citation]; placing unlawful or unenforceable terms in form contracts [citation]; asserting a contractual right one does not have [citations]; systematically breaching a form contract affecting many consumers [citation], or many producers [citation]; and imposing contract terms that make the debtor pay the collection costs [citation]." (Fn. omitted.) The same fundamental analysis of the requirements of the UCA was described in Podolsky v. First Healthcare Corp. (1996) 50 Cal.App.4th 632, 647.
In applying the tests set forth in State Farm and Podolsky, we are directed to balance the detrimental impact of the business practice in question against the justification for such practice. What is "the utility of the . . . conduct against the gravity of the harm" to the consumer? Would subjecting a gasoline purchaser who uses a debit card to the placement of a hold on his or her bank account in excess of the purchase price for a period beyond the fueling event without disclosure be "substantially injurious to consumers"?
First, no rationale has been suggested why service station owners may not disclose to their debit cardholder customers information concerning the placement of holds in the described situation. Second, without such knowledge, these customers may be adversely affected by having their checks dishonored by their financial institutions or by having to pay overdraft fees as a result of subsequent uses of their debit cards or checks. Accordingly, in the absence of satisfactory justification for the business practice and the potential for the practice to be substantially injurious to debit cardholders, we find that nondisclosure in these circumstances would constitute a violation of the UCA.
We conclude that when a customer uses a debit card to purchase gasoline at a service station, the service station owner may not cause a hold to be placed upon the customer's bank account before allowing the gasoline to be pumped where the amount of the hold is in excess of the purchase price of the gasoline ultimately pumped, the hold extends beyond the fueling event, and the owner does not inform the customer of the existence of the hold.
 * * * * *
[1] We may assume for our purposes that the debit card customers would not be apprised by their financial institutions that holds would be placed on their accounts in the described circumstances. The debit card issuer may, of course, restrict the service station owner's ability to cause the placement of a hold on an account, but that would be a matter governed by the rules of the electronic funds transfer network of which the card issuer is a part, its own rules, and the terms and conditions of its agreements with its customers.
[2] All references hereafter to the Business and Professions Code are by section number only.